# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RICHARD BLEISER, ELFRIEDE KORBER, CHRISTOPHER MARK, | |
| Plaintiffs, | No. 08 C 6254 |
| v. | Judge James B. Zagel |
| BUNDESREPUBLIK DEUTSCHLAND, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Richard Bleier ("Bleier"), Christopher Mark ("Mark"), and Elfriede Korber ("Korber") filed their 241-page, twenty-four count, second amended complaint seeking payment and redemption of certain German gold-dollar bearer bonds. Defendants Commerzbank AG, Commerzbank "Chicago Branch", CommerzBank "New York Branch", CommerzBank "Los Angeles Branch", CommerzBank "Atlanta Branch", CommerzBank Capital Market Corp., a/k/a "CCMC" a division of CommerzBank AG, CommerzBank Securities, a division/subsidiary of CommerzBank AG, (collectively "Commerzbank"), Dresdner Bank AG, Deutsche Bank AG and Deutsche Bank/Bankers Trust Co., Citibank, N.A., JPMorgan Chase, N.A., Schroders PLC, UBS AG, Mizuho Corporate bank, and Credit Suisse Group AG (collectively "Defendants") have filed two joint motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defendants have also filed individual motions to dismiss on various grounds. Because of the numerous arguments presented as to each joint motion, here, I only address Defendants' motion to dismiss for lack of subject matter jurisdiction. For the following reasons, Defendants' joint motion to dismiss for lack of subject matter jurisdiction is denied.

## I. FACT STATEMENT

Following World War I ("WWI"), between 1924 and 1930, Germany issued hundreds of millions of United States dollar-denominated gold-backed bearer bonds (the "Bonds") to American citizens. The Bonds were underwritten in the United States and payable through corporate trustees or paying agents in the United States. When Hitler came to power in 1933, the payment on the Bonds ceased and the Bonds went into default.

Defendants contend that between WWI and World War II (WWII) a significant number of the bonds were reacquired by Germany for retirement, thus no longer representing valid obligations. However, because of WWII, Germany was unable to present the bonds to the American trustees for cancellation. As a result, redeemed, but un-cancelled bonds were held in German bank vaults. Upon Russia's occupation of Germany, these un-cancelled bonds were looted from the banks and redistributed.[1] Plaintiffs, however, contend that such looting never occurred, and they attribute such claims to Defendants' scheme to defraud bondholders.

In 1951, a series of meetings were held in London to determine how Germany would pay pre- and post-war debt. There, Germany agreed to take full responsibility for all of the pre-war debt, including the German Gold Bonds. The Law for the Validation of German Foreign Currency Bonds ("The Validation Law") was enacted by the German Government on August 25,

---

[1] The facts surrounding the looting appear to be generally accepted: The 1953 Agreement Between the United States of America and the Federal Republic of Germany Regarding Certain Matters Arising from the Validation of German Dollar Bonds refers to the nations' common interest "to provide for the determination of the validity of German dollar bonds in view of the possibility that a large number of such bonds may have been unlawfully acquired," and other American courts that have addressed the matter have assumed the looting to be an historical fact. *See Abrey v. Reusch*, 153 F. Supp. 337 (S.D.N.Y. 1957); *Dix v. Commissioner of Internal Revenue*, 34 T.C. 837 (U.S. Tax Ct. 1960).

1952.  It established the procedures and criteria for validation.  The validation procedures were incorporated by reference into the Agreement Between the United States of America and the Federal Republic of Germany Regarding Certain Matters Arising from the Validation of German Dollar Bonds ("Certain Matters Treaty"), which states that "[n]o bond . . . shall be enforceable unless and until it shall be validated either by the Board for Validation of German Bonds in the United States established by the Agreement on Validation Procedures, or by the authorities competent for that purpose in the Federal Republic."  4 U.S.T. 885, Art II.  The Agreement on German External Debt 1953 (commonly referred to as the "London Debt Accord") was entered into by Germany, the United States, and other nations to reduce Germany's debt and negotiated contemporaneously with the Certain Matters Treaty.  The London Debt Accord was a government-sponsored settlement proposal relative to German external debt whereby creditors were offered settlement proposals.

The named Plaintiffs are the owners of German Gold Bearer Bonds and bring this suit individually and on behalf of class members similarly situated.  Plaintiffs allege that Defendants are the redemption or paying agents for the bonds and are liable for payment on the bonds.[2]

---

[2] Plaintiffs allege twenty-four counts in their complaint including : Count I: conspiracy to defraud; conspiracy to breach contractual obligations; conspiracy to breach good faith and fiduciary duties; Count II: negligent misrepresentation; Count III: constructive fraud; Count IV: fraud; Count V: piercing the corporate veil/alter-ego; respondeat superior or principal/agent liability; Count VI: wrongful expropriation/taking of property; Count VII: negligence and/or negligent supervision; Count VIII: unjust enrichment; Count IX: conversion; Count X: accounting; Count XI: damages from refusal and/or delay production of documents; Count XII: breach of contract (express and/or implied); Count XIII: breach of fiduciary duty; breach of implied covenants of good faith; Count XIV: claim for damage for defendants' default and failure to pay the bonds; Count XV: promissory and equitable estoppel; Count XVI: restitution; Count XVII: RICO claims; Count XVIII: damages for violations of international law; Count XIX: violations of Securities Act 1933 and Securities Exchange Act 1934; Count XX: violations of Uniform Commercial Code; Count XXI: replevin and safekeeping; Count XXII: violations of

Plaintiff Korber alleges that she was denied proper redemption of her bond when she submitted her bonds to the Commerzbank "Examining Agency" in Germany. Mark and Bleier also allege that they have been denied validation. They allege that they have effectively been denied this right because no "Validation Board" exists in Germany or the United States. Furthermore, Plaintiffs allege that Plaintiffs' counsel requested redemption of bonds on behalf of Plaintiffs and have received no adequate response. Alternatively, Plaintiffs allege that Defendants have been negligent and/or incompetent in providing meaningful redemption and validation procedures.

Plaintiff filed a first amended complaint on February 4, 2009, which Defendants have jointly moved to dismiss. On May 11, 2009, Plaintiff filed a motion for class certification. The briefing on that motion has been stayed pending ruling on the joint motion to dismiss. Plaintiffs then asked for, and were granted, leave to file a second amended complaint. Defendants now move jointly to dismiss Plaintiffs' second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II. STANDARD OF REVIEW

A motion to dismiss filed pursuant to Rule 12(b)(1) challenges the federal court's jurisdiction to hear the complaint. Fed. R. Civ. P. 12(b)(1). "It is well established that federal courts are courts of limited jurisdiction and may adjudicate a case only if there is *both* constitutional and statutory authority for federal jurisdiction." *Lewis v. Eisenberg,* No. 10-126, 2010 U.S. Dist. LEXIS 74092, at *2 (E.D.Wis. July 22, 2010) (citing *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 808, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)). In ruling on such

---

the Alien Tort Statute Act 28 U.S.C. § 1350; Count XXIII: Violations of 18 U.S.C. § 1001; Count XXIV: intentional infliction of emotional distress.

a motion, I accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences from those facts in the plaintiff's favor. *Dixon v. Page*, 291 F.3d 485, 486 (7th Cir.2002).

**III. DISCUSSION**

Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Defendants argue that the Certain Matters Treaty denies this court jurisdiction because Plaintiffs have failed to follow the procedures set forth in the Treaty. Essentially, Defendants argue that Plaintiffs' failure to validate their bonds precludes any action in this court.

In determining whether the Certain Matters Treaty denies this court subject matter jurisdiction I must first examine the text of the treaty. *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning"). Article II of the Certain Matters Treaty provides that:

> No bond, coupon, dividend warrant, renewal certificate, subscription warrant or other secondary instrument referred to in the first sentence of Article I above shall be enforceable unless and until it shall be validated either by the Board for the Validation of German Bonds in the United States established by the Agreement on Validation Procedures, or by the authorities competent for that purpose in the Federal Republic.

4 U.S.T. 885, art. II.

Accordingly, Defendants argue that under the Certain Matters Treaty, a bondholder who has not validated his bonds may not resort to the courts of the United States to enforce his rights under such bonds. It is undisputed that Plaintiffs' bonds have not been validated, however, Plaintiff Korber alleges that she was denied proper redemption of her bond when she submitted her bonds for redemption, payment and validation to Commerzbank "Examining Agency" in Germany.

Furthermore, Plaintiffs allege that Plaintiffs' counsel requested redemption of bonds on behalf of Plaintiffs and has received no adequate response.

Defendants suggest that Article II precludes a plaintiff from bringing an action in the United States to enforce its rights unless he has validated bonds. That meaning, however, does not necessarily flow from a reading of the plain language of the treaty. While Article II states that no bond "shall be enforceable unless and until it shall be validated," "that does not necessarily mean that a plaintiff may not bring a legal action in the United States courts to seek enforcement of a bond that has not been validated." *World Holdings, LLC v. Federal Republic of Germany* , 613 F.3d 1310, 1315 (11th Cir. 2010). The language of a treaty must be read in context and in consideration of the treaty's object and purpose; 'context' includes a reading of the preamble. *World Holdings*, 613 F.3d at 1316 n. 10.

The preamble of the 1953 Treaty states:

> [T]he United States and the Federal Republic agree that further measures are required to permit debtors and creditors to proceed to the orderly settlement of the obligations arising from German dollar bonds with confidence in the stability of the procedures regarding validation and with assurance that claims prejudicial to such settlement will not be asserted on the basis of bonds which were unlawfully acquired.

4 U.S.T. 885, pmbl., para. 5 (emphasis added). Again, this language does not address the issue of immunity from suits in the United States, though it does amplify the language of Article II that "[n]o bond ... shall be enforceable unless and until it shall be validated." *World Holdings*, 613 F.3d at 1315.

Recently in *World Holding*, the Eleventh Circuit addressed the issue of subject matter jurisdiction regarding German gold bonds in a different context. In *World Holding*, the Eleventh

Circuit held that Germany was not immune from suit pursuant to the Foreign Sovereign Immunities Act ("FSIA") because language in the treaty providing that no bond "shall be enforceable unless and until it shall be validated" did not expressly conflict with the FSIA commercial-activity exception to sovereign immunity; the treaty was silent on the question of immunity. *World Holding*, 613 F.3d at 1316 . Under FSIA, a foreign state is immune from the jurisdiction of the courts of the United States unless a defined exception applies. Among FSIA's exceptions to immunity is the commercial-activity exception of section 1605(a)(2). While Germany conceded that the issuance and sale of bonds in the United States brought it within FSIA's commercial-activity exception to immunity, it argued that it was nonetheless immune from suit because there was an express conflict between FSIA and the language of Article II of the Certain Matters Treaty. The Court found that Article II was silent on the question of immunity and declined to read it as preventing a plaintiff from bringing an action in the courts of the United States unless it has validated its bonds. *Id*. at 1316. Indeed, the Eleventh Circuit noted that the provision that no bond "shall be enforceable unless and until it shall be validated" does not mean that "a plaintiff may not bring a legal action in the United States courts to seek enforcement of a bond that has not been validated." *Id*.

In reaching this conclusion, the Eleventh Circuit considered the plain language of the statute and its preamble. The Court found that the language of Article II did not "explicitly express[] an intent to deny claimants access to the United States courts to determine whether their bonds are enforceable." Finding that the plain language of the Certain Matters Treaty does not expressly conflict with FSIA, the Court affirmed the district court's denial of Germany's motion to dismiss for lack of subject matter jurisdiction. *Id*. at 1317. The Court added that the

7

district court could still determine that the plaintiff's failure to comply with the validation requirement of Article II renders its bonds unenforceable. *Id.* I am not persuaded that the plain language of the Certain Matters Treaty precludes this court's subject matter jurisdiction over the matter before me.

Defendants in this matter also offer legislative history to show that subject matter jurisdiction in this court is not proper, specifically, the "Message from the President of the United States Transmitting" the London Debt Accord and the Certain Matters Treaty, among others, for ratification to the Senate ("Message").[3] The excerpt explains that because of perceived uncertainty regarding the validity of the bonds, in addition to the procedural validation requirement,

> a further measure was required to prevent the holders of looted bonds from using the processes of American courts to enforce payment on them. To this end, a second agreement between the Government of the United States and the Government of the Federal Republic was signed at Bonn on April 1, 1953 [The Certain Matters Treaty]. This agreement provides that the holders of dollar bonds that have not been duly validated cannot resort to the courts in the United States for the purpose of enforcing their rights under such bonds.

Message from the President to the Senate, Summaries and Discussion of Individual Agreements; Statistics, Enclosure 7(d) annexed to Hearings before the Committee on Foreign Relations, 83rd Congress, 1st Sess. p. 232.

The President further addressed the role of the United States courts stating:

> In order to make validation effective and to bar the assertion of claims by holders of bonds looted by the Russians, this agreement has the purpose of preventing holders of non-validated bonds from enforcing these bonds in judicial or other proceedings in the United States.

---

[3] The portion of the Message cited Defendants is contained in "Enclosure 7(d)" ("Summary of Validation Law and Implementing Agreements"), appended to a letter from Secretary of State John Foster Dulles to President Eisenhower discussing the agreements submitted for ratification.

Message from the President to the Senate, at p. 234.

Defendants argue that this message illustrates the Executive Branch's interpretation of the treaty and is entitled to substantial weight. *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 355 (2006) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight.") (quoting *Kolovrat v. Oregon*, 366 U.S. 187, 194, (1961)).

The defendant, Germany, in *World Holding* also cited the Message from the President in its briefing asking the Court to deny subject matter jurisdiction. In dicta, the Eleventh Circuit noted that it did not need to consider extraneous sources when it found no express conflict within the text of the Certain Matters Treaty. However, it went on to state that even if it did consider the Message in their analysis, that "when considered in its entirety, it is inconclusive as to the view of the State Department on the rights of bondholders who did not accept the [London Debt Accord's] offer of settlement to resort to United States courts." *World Holding*, 613 F.3d at 1317 n. 11; *See* Enclosure 7(a) ("Summary of Agreement on German External Debts and Its Annexes"), at 204.

While it is true that the issues considered by the *World Holding* Court are distinguishable, the Eleventh Circuit's discussion is useful to my analysis. Plaintiffs assert that they did not accept the terms of the London Debt Accord, and are therefore not bound by it while Defendants argue that the Certain Matters Treaty withholds subject matter jurisdiction from this court for claims relating to unvalidated bonds and does not distinguish between holders of bonds who do not accept the offer contained in the London Debt Accord. However, as suggested by the

Eleventh Circuit, the status of those who did not accept the terms of the London Debt Accord is "inconclusive." *World Holding*, 613 F.3d at 1317 n. 11.

I find that the Certain Matters Treaty does not preclude subject matter jurisdiction over the claims asserted and accordingly deny Defendants' motion to dismiss for lack of subject matter jurisdiction. As noted by the Eleventh Circuit, this decision does not preclude a finding that the bonds are unenforceable for failure to comply with the validation requirement of Article II, however, I find that this court has jurisdiction to make such a determination.

ENTER:

*James B. Zagel*
James B. Zagel
United States District Judge

DATE: October 7, 2010